# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

————————————————————————

|  |  |  |
|---|---|---|
| DUSTIN MOORE, ROY LEWIS, JOSH BLASCHKE, JUSTIN BLASCHKE, JULIO MORENO, and JUSTIN HERRERA, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil Case No. 5:15-cv-432-RCL |
| v. | ) ) ) | Consolidated with Civil Case No. 5:15-cv-346-RCL |
| PERFORMANCE PRESSURE PUMPING SERVICES, LLC and EPIC WIRELINE SERVICES, LLC. | ) ) ) ) |  |
| Defendant. | ) ) |  |

————————————————————————

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

Plaintiffs here seek to recover unpaid overtime wages and other damages under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq*. Before the Court is Plaintiffs' Motion [ECF No. 120] for Leave to File a Second Amended Complaint, Plaintiff Moore's Motion [ECF No. 127] for Summary Judgment, and the respective responses and replies. For the reasons articulated below, the Court will GRANT the Motion for Leave to File a Second Amended Complaint and DENY the Motion for Summary Judgment.

### II.  BACKGROUND

Plaintiffs are former employees of defendants Performance Pressure Pumping Services, LLC and Epic Wireline Services, LLC, providers of on-site oil well pumping services. These services

typically involved pumping fluid down the wellbore and preparing the wellbore by a process known as perforation in which explosives were used to prep the field for hydraulic fracturing. Plaintiffs acted as hands, operators, or wireline operators for defendants, performing essentially the same job.[1] Mot. 4. While some plaintiffs were salaried and others were hourly, plaintiffs here claim defendants' pay policies failed to give them proper overtime compensation.[2]  Specifically, plaintiffs allege that defendants did not properly calculate operators' regular rate of pay for the purposes of overtime because they did not include bonuses.  Summ. J. Mot. 4; Norton Dep. 68:8-15, ECF No. 127-2.

Epic and Performance maintain offices in various areas throughout Texas and Louisiana. Lane Depo. 6. However, based on the testimony of Epic's corporate representative, operators and wireline operators generally had the same duties no matter the location. Norton Depo. 44. The same is true for engineers and supervisors; they generally had the same duties no matter the location. *Id.* Similarly, based on the testimony of Performance's corporate representative, hands and operators had the same duties.  *Id.*[3]  A regular crew for Epic consisted of an engineer, a lead wireline operator, and two wirelines operators. Lane Decl. ¶ 6.

A regular pumping crew for Performance typically consisted of two people: an engineer/supervisor and an operator/hand. Broussard Depo. 35-37. An operator/hand mostly was concerned with pumping services, while an engineer/supervisor had more responsibilities running

---

[1] "Hand," "operator," or "wireline operator" are interchangeable terms referring to employees who assisted in fracking oil and gas wells and operating wireline equipment at the wells. In any event, it is undisputed that plaintiffs here worked as operators/hands or engineers/supervisors for either Epic or Performance.

[2] Plaintiffs contend that some employees, though misclassified as salaried, were in fact non-exempt from the overtime requirement of the FLSA. Mot. for Conditional Certification 4. The other employees were classified as hourly but were not properly compensated. *Id.*

[3] Performance's representative stated that some hands were more experienced than others, and that more experienced hands would be tasked to wellsites with specialized issues. Broussard Depo. 48-49. However, Broussard also testified that 98 percent of the business was standard pumping jobs, and all hands were expended to be able to do those pumping jobs. *Id.*

the jobsite.  Ultimately, each employee assisted in fracking oil and gas wells and operating wire line equipment at the wells. The crew would travel to the wellsite together, and often one would operate a pump while the other would assist. Broussard Depo. 38.  Depending on the employer and needs of the client/wellsite, a work crew would travel to a wellsite with either a pump truck, wireline truck, or Ford F-250 hauling a trailer carrying pipe, chemicals, explosives, or other necessary equipment. Lane Depo. 3.  Wire line and pump trucks are 18-wheeler trucks weighing over 10,000 pounds. Supervisors and engineers were sometimes directly provided the F-250 trucks. Broussard Depo. 38; Lane Depo. 44-45. Depending on the needs for the wellsite, supervisors would sometimes drive to a site simply to monitor the pump. Other times, supervisors would haul a trailer with pipe equipment for more prolonged work. *Id.* at 39. Depending on the wellsite and needs of the client, jobs could last up to a month and a half. *Id.* at 45. Once on location, the crew would often drop a trailer or other equipment before working with their clients to execute the particular well plan and other operations to facilitate fracking at the well. *Id.*  For longer jobs, crews would lodge near the well at a campsite or hotel.  *Id.*  Depending on the needs of the job, crew members could use the Ford F-250's to haul equipment, to travel between job sites, to travel to/from lodging, to travel to a company store for additional equipment, or to run personal errands. *Id.*

Since the circumstances and needs of the wellsites are were varied, all employees were required to have a commercial drivers' license because they may have been required to drive 18-wheelers to job sites. Similarly, employees may have been required to drive Ford F-250's to and from jobsites, depending on the requirements at the particular sites. Broussard Depo. 41. Thus, Performance employees were required to be able to operate both 18-wheelers and Ford F-250's to travel to, between, and from job sites. *Id.* at 41-43.  Chad Hygh testified that he drove an F-250

"every day" to go to and from the wellsite, to get supplies, oil or rebuild kits, etc, and that he often drove the trucks on the interstate. Hygh Depo. [ECF No. 127-7] 73. Other employees drove vehicles less regularly.

Plaintiffs contend that they were not adequately compensated at any time from May 26, 2012 to the present. Plaintiffs filed this collective action on May 26, 2015. On August 24, 2015, Judge Pitman conditionally certified two classes of individuals employed by Epic since May 26, 2012: 1) salaried hands, operators, or wireline operators, and 2) hourly hands, operators, or wireline operators. ECF No. 21. On January 11, 2016, Judge Pitman conditionally certified all salaried hands, operators, or engineers who were employed by Performance since May 26, 2012. ECF No. 65. In that order, Judge Pitman also directed the parties to confer and agree on a modified scheduling order that "accommodates the opt-in period but does not disrupt the dispositive motions deadline or the trial date." *Id.* at 6, n. 1.The parties then submitted a new scheduling order requiring additional parties to be joined on or before March 3, 2016. Unopp. Mot. Extend Deadlines in Scheduling Order [ECF No. 82]. The discovery deadline was set at March 31, 2016. *Id.*

On February 16, 2016, plaintiffs moved for leave to file a second amended complaint adding some Performance officers—Antoine Broussard, Jr., James Rapattoni, William Rigby, Sr., and Terry Lane—new defendants. ECF No. 86. Judge Pitman denied that motion on March 7, 2016 for two reasons. First, adding new defendants would cause undue delay because the additional defendants would need to be served and participate in discovery. Order [ECF No. 98] 3 ("When the Court directed the parties to modify the scheduling order, it did not intend to give Plaintiffs an opportunity to join new defendants at the eleventh hour."). Second, Judge Pitman determined that plaintiffs failed to explain why they had waited so long to seek leave to amend, noting that the

original deadline for amending pleadings to joining new parties was November 23, 2015 and that plaintiffs knew as early as October 2015 that these new defendants had been corporate officers. *Id.*

On March 30, 2016, this case was reassigned to Judge Royce C. Lamberth. ECF No. 104. Defendants moved to continue the trial setting and discovery deadlines[4] on the basis that defendants had been "unable to take the depositions of any witnesses in this case" due to scheduling conflicts and differences among the 58 opt-in class members. Mot. to Continue [ECF No. 107] 2. This Court granted the motion, extending discovery and motion deadlines by 120 days and vacating the original trial date. ECF No. 116. This extension put the new discovery deadline at July 29, 2016 and the new dispositive motions deadline at August 16, 2016.

On May 13, 2016, plaintiffs filed a "Reurged" Motion [ECF No. 120] for Leave to File a Second Amended Complaint. Plaintiffs seek leave to amend its complaint and add the four defendants that were denied by Judge Pitman's March 7 order.

On July 18, 2016, plaintiffs filed a Motion [ECF No. 127] for Summary Judgment. Plaintiffs seek summary judgment regarding the applicability of the FLSA, arguing that there is no exemption that would excuse defendants from paying overtime as required by the FLSA. Further, plaintiffs seek summary judgment regarding the number of hours worked by plaintiffs within the time period relevant to this action. Finally, plaintiffs argue that defendants cannot raise a genuine issue of material fact as to defendants' failure to include bonuses into the calculation of regular pay rates for the purposes of overtime. Accordingly, plaintiffs have moved for summary judgment

---

[4] Under Judge Pitman's scheduling order [ECF No. 26], the case was set for trial on July 5, 2016, discovery was to be completed by February 18, 2016, and dispositive motions were to be filed by April 18, 2016. A subsequent order [ECF No. 82] extended the discovery deadline to March 31, 2016.

that defendants failed to pay overtime compensation for all hours worked in excess of forty (40) per week.

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Leave to amend "is not automatic." *Matter of Southmark Corp.*, 88 F.3d 311, 314 (5th Cir. 1996). Rather, it is within the Court's discretion to deny leave to amend if there is "a substantial reason to do so." *Id.* In determining whether there is such a reason, "the court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id.* 314-15 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

The FLSA requires employers to compensate employees engaged in commerce for all hours worked over forty each week at the rate of one and one-half times their regular rate. 29 U.S.C. §

207(a)(1). The statute also specifically exempts certain employers and/or employees from its overtime requirements. *Id*. § 213. The plaintiff bears the burden of the elements of an FLSAS claim, such as whether an employee-employer relationship existed or that they worked hours in excess of 40 hours in a work week. However, an employer claiming an exemption bears the burden of proving its exempt status, and exemptions are to be narrowly construed against the employer. *Cleveland v. City of Elmendorf*, 388 F.3d 522, 526 (5th Cir. 2004). Exemptions under the FLSA are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption. *Barefoot v. Mid–America Dairymen, Inc.*, No. 93–1684, 1994 WL 57686, at *2 (5th Cir. Feb.18, 1994) (per curiam) (citing *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678, 67 S.Ct. 931, 91 L.Ed. 1158 (1947)).

## IV.  ANALYSIS

### a.  Reurged Motion for Leave to File Second Amended Complaint

Plaintiffs argue that Judge Pitman's rationale for denying the prior motion for leave to file no longer exists because the trial date has been stayed indefinitely. Reurged Mot. [ECF No. 120] 1. Plaintiffs seek to add individual officers of Performance—Antoine Broussard, Jr., James Rapattoni, William Rigby, Sr., and Terry Lane—as defendants, claiming that these individual officers were "employers" under the FLSA. Reurged Mot. 3; Proposed Second Am. Compl. [ECF No. 86-1] 6-7. According to plaintiffs, they were unable to ascertain whether these officers qualified as "employers" based on defendants' initial disclosures. Reurged Mot. 4. Rather, plaintiffs claim that their investigations during discovery have only now given "sufficient factual basis to add them to the case as individual Defendants." *Id.*

Defendants object, arguing that the reurged motion is a bad faith attempt to escape the effects of missing a deadline. Resp. [ECF No. 122] to Reurged Mot. 5. In support, defendants

argue that plaintiffs opposed the extension and have no produced a single document in this case. *Id.* Defendants argue that plaintiffs should not now be able to attempt to use the extension for their benefit. This Court disagrees. While plaintiffs have clearly taken alternative positions, that does not amount to bad faith. That plaintiffs opposed the extension does not preclude them from filing a motion to reconsider in light of the shifting circumstances surrounding this case.

Defendants also attempt to show bad faith by pointing to a similar case: *John Newton, et al. v. Epic Wireline Services, LLC, et al*, Case No. 5:16-cv-25-XR (W.D. Tex. 2016). Plaintiffs' original complaint in *Newton* was filed on January 12, 2016, naming Performance and Epic as defendants. Case No. 5:16-cv-25, ECF No. 1. On March 16, 2016, after Judge Pitman denied the original motion for leave to file a second amended complaint, the *Newton* plaintiffs amended their complaint naming Broussard, Rapattoni, Wigby, and Lane and removing Performance and Epic as defendants.[5] Case No. 5:16-cv-25, ECF No. 5. Performance and Epic are not named defendants in *Newton*.

Defendants argue that this amounts to a bad faith attempt to circumvent Judge Pitman's March 7 order, and that there is no reason defendants did not seek information concerning these defendants earlier in the lawsuit. Plaintiffs counter that they only developed a reasonable belief that these defendants were "employers" under the FLSA during the discovery process, and that defendants' initial disclosures did not even include James Rapattoni or Terry Lane as persons who had knowledge about facts relevant to the case. Thus, at least with respect to Rapattoni or Lane, plaintiffs could not have sought information, or had a reasonable belief as to their roles as "employers" under the FLSA, until later in the discovery process. However, Broussard and Rigby *were* included in initial disclosures, and plaintiffs have still failed to explain why they did not seek

---

[5] Broussard, Rigby, and Lane have filed a Motion to Dismiss in *Newton*. 5:16-cv-25, ECF No. 10. Judge Rodriguez ordered a stay in *Newton*, pending the resolution of the Reurged Motion here. 5:16-cv-25, ECF No. 21.

leave to amend sooner than March 2016, only a few months before trial. Had the trial setting here not been vacated, this Court would be hesitant—as Judge Pitman was—to allow leave to add additional defendants and unduly delay trial. However, there is no indication that the requests here, or the filings in *Newton*, were made in bad faith.

As defendants note, this case has been ongoing since May 2015, and the initial deadline to amend pleadings and add parties passed in November 2015. *Id.* Indeed, while Judge Pitman allowed modification of the scheduling order, he "did not intend to give Plaintiffs an opportunity to join new defendants at the eleventh hour." ECF No 98. But defendants then requested this Court vacate the trial setting and extend discovery and motions deadlines, which this Court granted. ECF No. 116. In their request for continuance, defendants stated they needed additional time for depositions and in-depth review of the 58 opt-in class members, as well as time to develop their positions and brief issues such as whether plaintiffs are sufficiently similarly situated to warrant a collective action. ECF No. 107. Further, after the vacatur of the trial setting and extension of deadlines, this Court granted leave for defendants to file a Second Amended Answer, ECF No. 114, and Third Amended Answer, ECF No. 115.

This case is still developing; the parties are still developing their positions, and it seems clear to this Court that this case is not close to being ready for trial. Addition of defendants at this time would not be at the "eleventh hour," as it was when Judge Pitman denied leave to file. Accordingly, this Court finds that the rationale underlying Judge Pitman's March 7 order no longer exists. Finally, the interests of judicial economy will be served by allowing plaintiffs to amend their complaint and to pursue all of their claims here, rather than in *Newton*. This Court therefore determines that the interests of justice are served by allowing plaintiffs the opportunity to file a second amended complaint.

The Court stresses that it is incredibly hesitant to reconsider previous motions, particularly those of another judge. It is unlikely that similar requests, particularly requests to further amend the pleadings here, will be viewed favorably. Further, attempts by either parties to extend deadlines or circumvent scheduling orders will be viewed with similar skepticism. Parties would do well to strictly adhere to the scheduling orders going forward. This Court is unlikely to be sympathetic to any conduct that could further delay the progression of this case.

### b. Motion for Summary Judgment

At the outset, the Court notes that plaintiff filed a motion [ECF No. 126] for leave to exceed normal page limitations for the motion for summary judgment. Defendant also filed an unopposed motion [ECF No. 129] for an extension of time to file their response to plaintiffs' motion for summary judgment. The Court will GRANT the motion for leave to exceed page limitations. The Court will also GRANT *nunc pro tunc* the unopposed motion in order to consider defendant's response.

Plaintiffs move for summary judgment on three key issues. First, they claim there is no issue of material fact as to the applicability of any FLSA exemption which would excuse Epic or Performance from compensating operators/hands or supervisors/engineers for hours worked in excess of 40 hours in a workweek. Second, plaintiffs claim there is no issue of material fact as to the number of hours worked within the relevant timeframe in this case. Finally, plaintiffs claim there is no issue of material fact regarding Epic or Performance's inclusion of bonuses paid to plaintiffs in the calculation of their regular rate for the purposes of overtime compensation under the FLSA. Accordingly, plaintiffs argue they are entitled to summary judgment as a matter of law. The Court will take each argument separately.

### i. There is a fact question as to the applicability of an FLSA exemption.

An employer bears the burden of establishing that its employees are exempted under the FLSA. *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 477 (5th Cir. 2010). Moore argues that defendants cannot raise a genuine issue of material fact as to *any* exemption from overtime compensation under the FLSA. Summ. J. Mot. 2, ¶5. According to Moore, "[p]laintiff did not qualify for the executive, administrative, professional, Motor Carrier Act (MCA) to the FLSA's overtime requirements." *Id.* at 9-10. In their answer, defendants claimed three exemptions in this case: the Executive exemption,[6] the Motor Carrier Act exemption,[7] and the Highly Compensated exemption.[8] Summ. J. Resp. 2, n. 2; Third Am. Answer [ECF No. 102-1]. However, defendants have only argued the applicability of the Motor Carrier Act exemption here. Accordingly, defendants have waived arguments as to the other exemptions and the Court's analysis is limited

---

[6] The FLSA's overtime requirements do not apply with respect to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Employees employed in a bona fide executive capacity means any employee (1) compensated with a salary of at least $455 per week, (2) whose primary duties are managing the enterprise, or managing a customarily recognized department or subdivision of the enterprise, (3) who customarily and regularly directs the work of two or more other employees, and (4) who has the authority to hire or fire other employees, or whose suggestions or recommendations are given particular weight. 29 C.F.R. § 541.100.

[7] The FLSA, 29 U.S.C. § 213(b)(1), exempts employees for whom the Department of Transportation has established "qualifications and maximum hours of service" under the Motor Carrier Act, 49 U.S.C. § 31502. Known as the "Motor Carrier exemption," this provision exempts employees who are (1) employed by a motor carrier or private carrier, as defined by 49 U.S.C. § 13102, and (2) drivers, driver's helpers, loaders, or mechanics whose duties affect the safety of operation of motor vehicles in transportation on public highways in interstate and foreign commerce. 29 C.F.R. § 782.2(a).

[8] Employees are exempt from the FLSA's overtime requirements if (1) the employee receives a total annual compensation of at least in the 90th percentile of full-time nonhourly workers nationally, and (2) the employee customarily and regularly performs any one or more of exempt duties or responsibilities of an executive, administrative, or professional employee. 29 C.F.R. § 541.601(a). As of this date, such an employee must receive annual compensation of at least $134,004.00. 29 C.F.R. § 541.601(b).

solely to whether a genuine issue of material fact exists regarding the applicability of the Motor Carrier exemption to the FLSA.

Defendants argue there is sufficient evidence to raise a fact issue as to whether Defendants are covered by the MCA exemption. "Namely, as part of their duties, Defendants required operators to maintain a commercial drivers' license, to comply with Department of Transportation regulations, and regularly drive large trucks weighing more than 10,001 pounds and carrying Defendants' equipment, tools, chemicals, and explosives to and from client worksites on public highways." Resp. [ECF No. 130] 2.

### 1. The Motor Carrier Exemption

As noted, the MCA exemption "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." *Songer v. Dillon Resources,* 618 F.3d 467, 472 (5th Cir. 2010) (quoting 29 C.F.R. § 782.2(a)). The MCA exemption applies to employees who are (1) employed by a motor carrier or private carrier, as defined by 49 U.S.C. § 13102, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act. 29 C.F.R. § 782.2(a).[9] Motor vehicle means a "vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical

---

[9] The FLSA exempts employees for whom the Department of Transportation has established "qualifications and maximum hours of service" under the Motor Carrier Act. Under the Motor Carrier Act, the Secretary of Transportation has authority to proscribe requirements for employees of motor carriers or motor private carriers. Motor carrier means "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 51501 (importing the definition from 49 U.S.C. § 13102(14)). Motor private carrier means "a person, other than a motor carrier, transporting property by motor vehicle when the transportation is as provided in 49 U.S.C. § 13501, the person is the owner, lessee, or baillee of the property being transported, and the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 51501 (importing the definition of 49 U.S.C. § 13501(15)). Under 49 U.S.C. § 13501, the Secretary of Transportation has jurisdiction over motor carrier transportation between states or motor carrier transportation on public highways.

power and used on a highway in transportation, or a combination determined by the Secretary [of Transportation]." 49 U.S.C. § 13102(16). Activities affecting the safety of motor vehicles are included in the work of drivers, driver's helpers, loaders, or mechanics. 29 C.F.R. § 782.2(b)(1) (citing *Levinson v. Spector Motor Serv.,* 330 U.S. 649, 678, (1947)); *see also* 29 C.F.R. §§ 782.3-782.6 (defining "drivers," "drivers' helpers," "loaders," and "mechanics").

A driver is an individual who drives a motor vehicle in transportation in interstate or foreign commerce, including employees with partial duties as drivers and other nondriving work. 29 C.F.R. § 782.3. Driver's helpers is an employee other than a driver who is required to ride on a motor vehicle while it is being operated in interstate or foreign commerce, including partial-duty helpers. 29 C.F.R. § 782.4. A loader is an employee of a carrier—*i.e.* a person providing motor vehicle transportation for compensation or a person transporting property by motor vehicle, 49 U.S.C. §§ 13102(14), (15)—whose duties include, among other things, the proper loading of his employer's motor vehicles so they may be safely operated on highways. 28 C.F.R. § 782.5. Thus, it has been determined that the safety of operation of motor vehicles on the highways is directly affected by the activities of these sorts of employees, even if the duties of such employees include other duties that do not affect motor vehicles.

Thus, the general rule is that:

> if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, driver's helpers, loaders, or mechanics employed by a common carrier and engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities ... he comes within the exemption in all workweeks when he is employed at such job.... Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which are actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a

workweek when the employee happens to perform no work directly affecting "safety of operation."

*Allen v. Coil Tubing Serv., LLC,* 755 F.3d 279, 284 (5th Cir. 2014) (quoting 29 C.F.R. § 782.2(b)(3)). "On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be *de minimis*, the exemption will not apply to [the employee] in any workweek so long as there is no change in his duties." *Id.*; *see also Pyramid Motor Frieght Corp. v. Ispass et al.*, 330 U.S. 695 (1947); 29 C.F.R. § 782.2(b)(3).

Defendants argue that Epic and Performance employees fall under the MCA exemption as motor private carriers because they own the chemicals, tools, and equipment that their operators transport via public highways to their wellsites. Resp. 13. Thus, defendants claims, the employees here are exempt from the FLSA overtime requirements under the MCA because (1) the employees here are employed by a motor private carrier, and (2) they are drivers or loaders, engaged in activities directly affecting the safety of operation of motor vehicles in the transportation on the public highways. *Id.* at 13-14; *see also* 29 C.F.R. § 782.2(a). For support, defendants point out that each Epic wireline operator is assigned to diver either a wireline truck, a crane truck, or a Ford F-250 truck to haul equipment and tools between work yards and wellsites.[10] Lane Decl. ¶ 6. Similarly, each employee on a Performance pump crews is required to drive either a pump truck or a Ford F-250 truck to haul equipment and tools between work yards and wellsites.[11] Lane Decl. ¶8. Plaintiffs were responsible for loading and unloading chemicals and tools from the trucks once

[10] Wireline trucks carry wireline equipment, such as spools or single-strand or multi-strand wires and cables. Lane Decl. [130-1] ¶4. Crane trucks carry a hydraulic crane with 55-ton load capacity. *Id.* The Ford F-250's haul a trailer containing pumping equipment and tools required at the wellsite. *Id.*at ¶6.
[11] Pump trucks haul tractor-trailers containing all of the pumping equipment and machinery needed to perform the relevant operations at the wellsite. Lane Decl. ¶4. The Performance Ford F-250's haul trailers containing iron pipes needed at the wellsite. *Id.* at ¶8.

they reach the wellsite. Blaschke 26-27. These employees were also required to maintain commercial driver's licenses. Lane Decl. ¶ 9; Helms Depo. 21:4-10, 76; Blaschke Depo. 29; Bond Depo. 27. They also complete hours of service logs and inspection reports in compliance with Department of Transportation regulations covering drivers of commercial motor vehicles. Lane Decl. ¶ 9; Blaschke Dep. 31; Bond Depp. 51-52; Helms Depo. 109. At bottom, defendants claim the MCA exemption applies because plaintiffs "could be called on to drive a pump truck, crane truck, wireline truck, or a Ford F-250 truck hauling a trailer and equipment" in interstate commerce. Resp. 13-14 (citing *Songer v. Dillon Res., Inc*., 618 F.3d 467, 475 (5th Cir. 2010).

Based on the presented evidence, the Court finds that Epic and Performance have raised sufficient evidence to normally trigger the MCA exemption. However, this is not the end of the Court's inquiry because plaintiffs argue that they are covered by the FLSA pursuant to Section 306 of the SAFETEA-LU Technical Corrections Act (TCA), Pub. L. No. 110-244, 122 Stat. 1572, 1620. Thus, this Court must assess whether defendants have raised sufficient factual questions placing plaintiffs outside the TCA.

### 2. The TCA codified a Small Vehicle Exception to the MCA Exemption.

In 2008, Congress enacted the TCA.[12] Under Section 306 of the TCA, the FLSA is applicable to "a covered employee notwithstanding [the MCA Exemption]." *Id.* Section 306(c) defines a covered employee as an individual:

---

[12] In 2005, Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), to amend the definition of motor carrier to a person providing "commercial motor vehicle transportation," but did not similarly narrow the scope of the MCA exemption regarding a motor private carrier's employee. Pub. L. No. 109-59 § 4142(a), 119 State. 114, 1747; *see also Allen*, 846 F. Supp. 2d at 678. The TCA restored the original definition of "motor carrier."

(1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);

(2) whose work, **in whole or in part**, is defined–

    (A) **as that of a driver, driver's helper, loader, or mechanic**; and

    (B) **as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less** in transportation on public highways in interstate or foreign commerce, except vehicles–

        (i) designed or used to transport more than 8 passengers (including the driver) for compensation;

        (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or

        (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* (emphasis added).

Thus, regardless of the terms of the MCA exemption, the overtime requirements of the FLSA apply to employees (1) who are employed by a motor carrier or motor private carrier, (2) whose work, in whole or in part, is defined as that of a driver, driver's helper, loader, or mechanic and affects the safety of motor vehicles weighing 10,000 pounds or less in transportation on public highways, and (3) who perform duties on motor vehicles weighing 10,000 pounds or less. *Id*. This is known as the Small Vehicle Exception.

While the Small Vehicle Exception clearly narrowed the applicability of the Motor Carrier Exemption, courts have struggled with quantifying exactly *how much* work with small vehicles renders an employee "covered" under the FLSA. Plaintiffs argue that the TCA's language unambiguously requires covered employees whose work concerns vehicles weighing less than

10,000 pounds to be paid overtime in accordance with the FLSA. Summ. J. Mot. 16-17. Specifically, plaintiffs argue that the TCA's language "whose work, in whole or in part, is defined as that of a driver, driver's helper, loader, or mechanic, and [affects] the safety of operation of motor vehicles weighing 10,000 pounds or less" should be broadly construed in light of Supreme Court precedent and the traditional approach to the FLSA. *See IBP, Inc. v. Alvarez,* 546 U.S. 21, 25-28, 126 S. Ct. 514; 163 L. Ed. 2d 288 (2005) (construing the term "work" broadly); *CSX Transportation, Inc. v. McBride*, 564 U.S. 685, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011) (noting the breadth of the phrase "in whole or in part"); *Arnold v. Ben Kanowsky, Inc*., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960) ("[E]xemptions [to the FLSA] are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."); *A.H. Philips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (recognizing that the FLSA is remedial and nature, and exceptions to it should therefore be construed narrowly); *Songer v. Dillon Res., Inc*., 618 F.3d 467, 471 (5th Cir. 2010) ("Exemptions under the FLSA are construed narrowly against the employer. . . ."). In short, plaintiff argues that the use of such broad language clearly evinces an intent of Congress to cover employees dealing "in part" with small vehicles even if they also work "in part" with larger ones. In other words, that Congress contemplated employees working with "mixed fleets" of large *and* small vehicles, and that the "in whole or in part" language grants FLSA coverage to employees as long as their work involves vehicles weighing 10,000 pounds or less, no matter how small that portion of their duties is—even *de minimis* duties. *See* Summ. J. Mot. 18 (noting the Supreme Court's holding in *CSX Transportation,* 131 S.Ct. at 2644 that the phrase "in part" includes conduct "no matter how small").

On the other hand, defendants appear to argue that the TCA requires an employee to perform "some meaningful work for more than an insubstantial amount of time (i.e. more than a *de minimis* amount of work) with vehicles weighing 10,001 pounds or less)." Resp. 12 (quoting *Allen*, 846 F. Supp. at 705; *Aikins*, 2015 WL 1221255 at *4; and *Lucas v. NOYPI, Inc.*, 2012 WL 4754729, at *9 (S.D. Tex. Oct. 3, 2012), *aff'd* 536 F. Appx. 416 (5th Cir. 2013)). In other words, defendants argue that notwithstanding the breadth of the "in whole or in part" language the TCA requires that an employee's duties <u>affect</u> the safety of operation of motor vehicles in transportation on public highways. Like in prior cases dealing with the FLSA and MCA, if an employee's work with small vehicles are so trivial, casual, and insignificant as to be *de minimis*, then that work does not affect the safety of operation of motor vehicles in transportation on public highways. Accordingly, such *de minimis* work activities cannot trigger the TCA, just like they cannot trigger the MCA. *See Pyramid*, 330 U.S. at 708.

At least one district court in this circuit recently followed "the majority of courts to have addressed the issue, and declined[d] to adopt a reading of the TCA that *significant* use of vehicles weighing more than 10,000 pounds excludes an employee from FLSA coverage." *Aikins v. Warrior Energy Servs. Corp.*, 2015 WL 1221255 (S.D. Tex. Mar. 17, 2015) (emphasis added). A more plausible reading is that, in order to be owed overtime, an employee must (1) perform <u>some work</u> that affects the safety of operation of small vehicles, and (2) it must be part of the employee's duties to do so. *Id.* This Court agrees, with the caveat that "some work" must at least rise above the level of *de minimis* work. Indeed, consistent with the caselaw on *de minimis* duties, work that is trivial, casual, and insignificant has no direct effect on the safety of operation of motor vehicles and would not render an employee covered under the TCA Small Vehicle Exception. *Id.*; *see also Allen*, 755 F.3d at 284 (recognizing that *de minimis* duties do no trigger the MCA exemption);

*McCall v. Disabled Am. Veterans*, 723 F.3d 962 (8th Cir. 2013) (cited in *Allen*, 755 F.3d at 291 n.6 for its discussion of the TCA and the Small Vehicle Exception).

Recognizing that *de minimis* duties cannot have a direct effect on the safety of operation of motor vehicles, it does not follow that an employee of a motor carrier or motor private carrier obtains FLSA coverage if their work involves vehicles weighing 10,000 pounds or less "no matter how small." If an employee's duties involving small vehicles are so small as to constitute *de minimis* duties, that employee is not a covered employee under the TCA exception. The employee must therefore conduct some meaningful work for more than an insubstantial time with vehicles weighing 10,000 pounds or less. *Allen*, 846 F. Supp. at 705. [13] However, for the reasons discussed below, it is the employer's burden to raise evidence that an employee's work with small vehicles is merely *de minimis* and outside the scope of the Small Vehicle Exception.

### a. Defendant bears the burden of establishing that they are exempt under the FLSA, including that the Small Vehicle Exception to the MCA Exemption *does not* apply.

Ordinarily, it is the plaintiff's burden to establish that he or she is covered by the FLSA, and it is the defendant's burden to establish an FLSA exemption. *See Mendoza v. Detail Solutions, LLC*, 911 F.Supp.2d 433, 439 (N.D. Tex. 2012) (citing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 120 (1946) for the proposition that employees must establish coverage by the FLSA); *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010) (noting that employers has the burden of establishing an exemption to the FLSA). Defendants argue that plaintiffs therefore have the burden of establishing the applicability of the TCA exception to the MCA exemption to prove they are

---

[13] The Court sees no distinction between this well-established *de minimis* standard and the language used in *Allen* that the Small Vehicle Exception requires "some meaningful work for more than an insubstantial time with vehciles weighing 10,000 pounds or less." 846 F. Supp. 2d at 705.

covered. Resp. 12 (citing *Garcia v. Western Waste Servs.*, Inc., 969 F.Supp. 2d 1252, 1261 (D. Idaho 2013)). Plaintiffs argue the opposite—that is, it is the defendant's burden to show that they were entitled to the MCA exemption, including the inapplicability of the TCA exception. Reply [ECF No. 131] 2-3. In other words, the parties here dispute where the burden of proof lies regarding the TCA exception.

Under the TCA, an employee driving vehicles weighing less than 10,000 pounds must be paid overtime in compliance with the FLSA. Those employees are "covered" under the FLSA, *notwithstanding* the MCA exemption. Because it is the plaintiff's burden to establish coverage of the FLSA, it is the plaintiff's burden to establish the requisites under the FLSA statute—*i.e.* that he or she was employed by a covered defendant, that either the plaintiff was engaged in commerce or the employer is engaged in commerce, and that the plaintiff worked 40+ hours in a workweek without adequate compensation. *See* 29 U.S.C. §§ 203-212. If the plaintiff can prove up those elements, the FLSA requires overtime compensation as a default. It is the employer's burden to demonstrate they are exempt from this default requirement to pay overtime. In the context of MCA/TCA cases, the burden must lie with the employer to establish that the MCA exemption applies *and that the TCA does not*.

As noted, the Small Vehicle Exception narrowed the range of employees covered by the MCA Exemption, applying the FLSA overtime requirements to such motor carrier or private motor carrier employees whose work, in whole or in part, affects the safety or motor vehicles weighing 10,000 pounds or less. *See Allen*, 846 F. Supp at 692-93. In the context of "mixed fleets," where employees are required to interact with vehicles both larger and smaller than 10,000 pounds, the large vehicles are largely irrelevant. "Even in weeks where employees worked on vehicles weighing more than 10,000 pounds (and thus were subject to the Department of Transportation's

regulations, those employees would still be entitled to overtime if they worked on vehicles weighing less than 10,000 pounds." *Hernandez v. Alpine Logistics, LLC*, 2011 WL 3800031, at *5 (W.D.N.Y. Aug. 29, 2011) (discussing Department of Labor, Wage & Hour Division, Fact Sheet # 19 (Nov. 2009), *available at* http://www.dol.gov/whd/regs/compliance/whdfs19.pdf). Thus, at the summary judgment stage, an employer must provide evidence that its employees exclusively drove vehicles greater than 10,000 pounds during a relevant workweek, or that any work with small vehicles was merely *de minimis* work. *Roche v. S-3 Pump Service, Inc.*, 154 F. Supp. 3d 441, 448-449 (W.D. Tex. 2016) ("Given the [] 'in whole or in part' language, it is the employer's burden to demonstrate that the employees exclusively drove vehicles greater than 10,000 pounds during a workweek.").

> **b. Defendants have raised a fact question as to whether plaintiffs' work with small vehicles is merely *de minimis*.**

Plaintiffs argue that Epic and Performance employees operated a mixed-fleet of large and small trucks, and that each plaintiff had duties as a driver of a motor vehicle with a gross vehicle weight of less than 10,000 pounds. Specifically, they point to evidence that plaintiffs drove Ford F-250 pickup trucks "routinely and as part of their regular job duties." Summ. J. Mot. 22. At Epic, hands and operators drove—or were expected to drive—those vehicles across state lines, depending on the needs for that particular wellsite. Blascke Depo. 65-66. At Performance, hands and supervisors were similarly expected to drive across state lines on a weekly basis. Broussard Depo. 40-41, 44. Thus, plaintiffs argue they are outside the MCA exemption and entitled to overtime wages as a matter of law. Defendants argue that there is a factual dispute regarding the amount of time and frequency plaintiffs drove small trucks in the course of their work.

Defendants argue that plaintiffs' are not covered by the TCA as a matter of law for two reasons. First, defendants argue the travel time between employee lodging and the oil well is non-compensable commuting time under the Portal-to-Portal Act. 29 U.S.C. § 254(a); 29 C.F.R. § 785.35. Under the Portal-to-Portal Act, no employer is liable for "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform and activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a). It is well established that "normal travel from home to work is not worktime." 29 C.F.R. § 785.35. The same is true for travel to and from lodgings, such as a hotel. To the extent that plaintiffs drove F-250s to and from their lodging and their worksites, that work is not compensable sufficient to trigger the Small Vehicle Exception.

Second, defendants argue that evidence in the record presents a fact issue as to the amount of time plaintiffs were required to drive Ford F-250's in the course of their duties. According to defendants, not only does the evidence show that plaintiffs spent "an overwhelming majority of their time driving motor vehicles" weighing less than 10,000 pounds, but there is "no uncontroverted evidence or stipulation regarding the frequency that plaintiffs drove Ford F-250's." Resp. 15, n. 6. While the evidence certainly suggests that—in general—Epic and Performance employees drove small vehicles, Performance's corporate representative testified that some employees might exclusively drive F-250s while others might drive 18-wheelers, depending on the superintendent supervising the crew. Broussard Depo. 43. Dustin Moore testified that he would sometimes use an F-250 truck to run errands or get something to eat, while other times he might use one to drive between wellsites or to get a piece of necessary equipment. Moore Depo. 85-88. Further, some employees driving F-250's were hauling trailers carrying pipes and other equipment. Broussard 41-42. According to defendants, Ford F-250's hauling trailers weighed more than

10,000 pounds. Lane Decl. 1. Thus, an employee driving an F-250 with a trailer would not be eligible under the Small Vehicle Exception unless he also drove an F-250 without a trailer for longer than an insubstantial amount of time.

Taken in the light most favorable to the nonmovant, as this Court must, the evidence in the record suggests that at least some employees may have had trivial or insubstantial duties involving vehicles weighing less than 10,000 pounds. A reasonable jury could find that at least some employees merely worked with small vehicles for a *de minimis* portion of their time. Accordingly, there remains a fact question as to when and how often each plaintiff individually performed duties with small vehicles—and particularly the percentage of plaintiffs' work small vehicles compared to other work—so as to qualify as a covered employee. *Allen*, 846 F. Supp. 2d at 705. Since each employees hours must be considered to ensure that it is more than *de minimis* work, there is not yet enough evidence to determine if plaintiffs' use of these small vehicles rises above the *de minimis* standard. At the very least, this remains a fact question. Accordingly, plaintiffs are not entitled to summary judgment as a matter of law regarding the applicability of an FLSA exemption.

### ii. There is a fact issue regarding the hours worked by plaintiffs.

Plaintiffs also claim there is no issue of material fact as to the number of hours worked within the relevant timeframe in this case. Mot. 2, ¶ 7 ("The number of hours worked by Plaintiffs during their employment with Defendants are undisputed."). Specifically, plaintiffs argue that defendants have admitted that plaintiffs worked anywhere from 12 to 14 hours per day. For support, plaintiffs point to interrogatory responses from Performance and Epic:

> Interrogatory No. 17. Identify each exemption to the FLSA that you contend applies to Plaintiffs, and for each such exemption, all of the facts known to you in support thereof.
>
> Response: None.

> Interrogatory No. 19. Please identify Defendant's decision making process of making decision not to pay Plaintiffs overtime for all hours worked in excess of forty (40) per week at the rate of time and one half of their regular rate of pay. Please identify each factor Defendant considered when making such decision and the name and job title of every person who participated in making the decision.
>
> Response: . . . Regarding the Plaintiffs that were paid otherwise, Plaintiffs chose to be paid at a rate for a guaranteed number of hours worked, based on a schedule of 14 consecutive days on followed by 7 days off, with employees working 14 hours per day worked. Defendant paid these persons in accordance with industry practice of paying this base wage . . . .

Performance's Objections and Responses to Plaintiff Moore's First Set of Interrogatories and Requests for Production, ECF No. 93-1. *See also* Epic's Responses to Plaintiff Moore's First Set of Interrogatories and Requests for Production:

> Interrogatory No. 8. Please state how many hours you contend that Plaintiffs worked each and every individual week during the Applicable Statutory Period:
>
> Response: . . . That is, generally, Plaintiff worked approximately 12 hours per day for two consecutive weeks, and then did not work the next two consecutive weeks. Sometimes, and Plaintiff would work "three weeks on, one week off," meaning that Plaintiff would work approximately 23 hours per day for three consecutive weeks, and then not work the next week. If a Plaintiff was not assigned to a well site, then Plaintiff generally performed no work for Defendant during that time.

ECF No. 93-2. Further, James Helms testified that Epic employees worked 14 hours a day, 14 days on and 7 days off. Helms Depo. 40. Terry Lane similarly testified that Performance employees worked an average of 14 hours per day. Lane Depo. 24. In short, plaintiffs claim that there is no material dispute that plaintiffs employed by Epic worked an average 12 hours per day and plaintiffs employed by Performance worked an average of 14 hours per day. Mot. 7, 26.

Defendants argue that plaintiffs mischaracterize these responses and ignore "hundreds of pages of timesheets produced in discovery reflecting the actual number of hours and shifts [employees] worked for Defendants." Summ. J. Resp. 19. Some of these timesheets show a number that plaintiffs worked in shifts, and that in many shifts plaintiffs were not assigned duties at a wellsite. Exhibit A-1 [ECF No. 130-1]. Further, both the interrogatory responses and testimony in the record suggests that some employees were not assigned to a wellsite during various periods of time. Those employees "generally performed no work for [d]efendant during that time." Interrogatory No. 8, ECF No. 130-9. Indeed, Terry Lane testified that:

> There were a many days during the time period relevant to this lawsuit that wireline operators and pump operators were not assigned duties to perform at a client wellsite. On days when there was no client work to perform, wireline operators and pump operators could be off of work entirely or assigned to work in the shop for a certain number of hours a day cleaning and maintaining company equipment and tools or building explosives. Plaintiffs recorded their hours of work on timesheets and submitted them to Epic and Performance.

Lane Decl. 2-3, ¶ 13. Finally, defendants have provided a sample of timesheets showing that plaintiffs did not uniformly work 12 or 14 hours workdays. Exhibit A-1, ECF No. 130-1.

This Court finds that a genuine dispute exists here. Plaintiffs have provided general approximations of the average numbers of hours worked during the relevant time. Taken in the light most favorable to the non-movants, the interrogatory responses, testimony, and timesheets cited by defendants raise a question of material fact as to the hours worked during the relevant time period. A reasonable jury could find that at least some employees worked less than 12 or 14 hours per week within the relevant time period. Since each employees hours must be considered to determine whether they are owed overtime compensation under the FLSA, there is not enough evidence before the Court to determine as a matter of law that plaintiffs and all similarly situated employees consistently worked 12 or 14 hour weeks during the relevant period. Accordingly,

summary judgment on the number of hours worked by plaintiffs is premature. Plaintiffs' motion for summary judgment regarding the number of hours worked will be denied.

### iii. There is a fact question as to defendants' inclusion of bonuses in the calculation of regular rate of pay.

Plaintiffs claim there is no issue of material fact regarding Epic or Performance's inclusion of bonuses paid to plaintiffs in the calculation of their regular rate for the purposes of overtime compensation under the FLSA. Under the FLSA, employees who work longer than 40 hours are entitled to receive overtime compensation at a rate of one and one-half times the "regular rate at which he is employed." 29 U.S.C. § 207(a). "Regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include . . . sums paid in recognition of services performed during a given period if . . . both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3). Thus, regular bonuses are to be included in the calculation of regular rate of pay, 29 C.F.R. § 778.209, but discretionary bonuses are excludable from the regular rate of pay, 29 C.F.R. § 778.211.

Plaintiffs also argue that defendants cannot raise a genuine issue of material fact that defendants failed to include bonus payments in the calculation of regular rate of pay. Mot. 2, ¶ 6. It is undisputed that Epic and Performance did not include bonuses when calculating regular rate of pay for the purposes of overtime. Plaintiffs claim that defendants regularly paid bonuses as long as certain criteria was met, and that regular bonuses were promised to plaintiffs during the hiring process. *See* Blaschke Personnel Action Notice, ECF No. 127-9 (noting pay at $5,500/month plus

a 2% bonus). Further, various employees testified that they expected regular bonuses and almost always received them. *See* Bond Depo. 75-76 (stating he could not recall not receiving a bonus unless the company was losing money, and that bonuses were "pretty much guaranteed");

Defendants claim that bonuses were discretionary and, therefore, properly excluded from the regular rate of pay under the FLSA. Summ. J. Resp. 7. Specifically, defendants point to plaintiffs' admissions that no operator had a right to a bonus, and that employment documents clearly stated that bonuses were discretionary. Hygh Depo. 74. Rather, numerous factors went into the decision to award a bonus, Lane Dep. 40-41; Norton Dep. 47, and some operators would not receive a bonus, Bond Dep. 83. Whether or not an employee received a bonus depended on job performance, attitude, cleanliness of equipment, tool maintenance, Norton Depo. 47; Helms Depo 47, but not hours worked, Broussard Depo. 47.

A genuine dispute of material fact exists here. There is evidence that bonuses were represented to employees as regular parts of their compensation, defendants have provided evidence that bonuses were discretionary and based on a variety of factors. Taken in the light most favorable to the non-movant, the evidence would allow a reasonable jury to determine that any bonuses paid to plaintiffs during the relevant time period were discretionary. Such bonuses would be excludable from the regular rate of pay under the terms of the FLSA. Thus, assuming the bonuses were discretionary, defendants' purported failure to include such bonuses would not be improper. Accordingly, the Court will deny summary judgment as to the inclusion of bonuses into the calculation of the regular rate of pay.

## V.    CONCLUSION

The Court finds that questions of material fact remain as to whether defendants are entitled to any exemption under the FLSA. Similarly, fact issues remain as to whether the defendants failed to include bonuses into the calculation of regular rate of pay for the purposes of overtime compensation. Finally, fact issues remain as to the number of hours worked by plaintiffs within the relevant time period here.

A separate order [ECF No. 133] issued March 31, 2017.

Royce C. Lamberth
United States District Judge

DATE: 4/26/17